# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GWEYNN MARIE BROWN,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br><br>　　　　　　　　Defendant. | Case No.: 16-CV-2873-BEN(WVG)<br><br>**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>**(Doc. Nos. 17 and 18.)** |

　　　This is an action for judicial review of a decision of the Commissioner of Social Security ("the Commissioner") denying plaintiff Gweynn Brown disability insurance benefits and supplemental security income benefits under Title XVI of the Social Security Act. 42 U.S.C. §§ 301 *et seq*. The parties have filed cross-motions for summary judgment, and the matter is before the undersigned magistrate judge for preparation of a report and recommendation. For the reasons stated below, the Court recommends that Plaintiff's motion for summary judgment be denied and that the Commissioner's motion be granted.

///
///
///
///

## I. BACKGROUND

### A. Procedural History

On November 14, 2012, Plaintiff filed a Title XVI application for supplemental security income disability payments alleging disability beginning on January 1, 2007. (AR 20, 147.) At the hearing and upon the advice of counsel, Plaintiff amended her alleged disability onset date to November 5, 2012. (AR 20, 35-36, 251.) Her alleged disability was due to Post Traumatic Stress Disorder ("PTSD"), major depression, and anti-social traits. (AR 22, 165, 252.)

Plaintiff's application was initially denied on March 12, 2013, and again upon reconsideration on January 14, 2014. (AR 20, 88, 97.) Plaintiff then sought further review and filed a written request for a hearing regarding her application denial. (AR 20, 103.)

On February 11, 2015, Plaintiff, represented by her attorney, appeared and testified at a hearing in San Diego, California before Administrative Law Judge ("ALJ"), Robin L. Henrie. (AR 20, 33-61.) On March 23, 2015, the ALJ issued a written decision finding that Plaintiff was not disabled and denied her benefits. (AR 17-32.) The Appeals Council denied Plaintiff's appeal on August 5, 2016. (AR 5.)

Plaintiff filed this action on November 22, 2016. (Doc. No. 1.) The Commissioner answered the complaint on March 10, 2017. (Doc. No. 13.) Plaintiff filed her motion for summary judgment on April 27, 2017. (Doc. No. 17.) The Commissioner filed her cross-motion on May 23, 2017. (Doc. No. 18.) Plaintiff did not file an opposition to the Commissioner's cross-motion for summary judgment.

### B. Medical Records

The administrative record before the ALJ contained the following medical records relating to Plaintiff's alleged impairments:[1]

---

[1] The Court here summarizes only the records relied on by the ALJ in his written decision, and by the parties in their cross-motions, as well those other records that the Court regards as particularly relevant. The Court has reviewed the entire administrative record.

Plaintiff saw Susan Swartz, MFT, eight times between December 6, 2012 and February 20, 2013. (AR 273.) Plaintiff provided Ms. Swartz a mental health report prepared in 2011 by Dr. Robert N. Page. (*Id.*) That report stated Plaintiff suffered from PTSD, Major Depressive Disorder, and Polysubstance Dependence. (*Id.*) Based on the limited interactions between Ms. Swartz and Plaintiff, Ms. Swartz found Dr. Page's diagnosis of Plaintiff's symptoms were accurate. (*Id.*) Ms. Swartz further opined that Plaintiff "would have little difficulty with . . . work-related physical activities but would have substantial difficulty with . . . work-related mental activities such as understanding, remembering, sustained concentration & persistence, social interaction, and adaptation." (AR 274.)

Alan Berkowitz, M.D., evaluated Plaintiff on February 26, 2013. (AR 285.) Dr. Berkowitz diagnosed Plaintiff with a history of depression, alcohol abuse in supposedly interval sustained remission, and polysubstance abuse in supposedly full sustained remission. (AR 287.) Dr. Berkowitz also diagnosed Plaintiff with probable obsessive compulsive disorder. (*Id.*) Dr. Berkowitz noted that Plaintiff had never been psychiatrically hospitalized and did not regularly see a psychiatrist. (AR 285.) Dr. Berkowitz opined Plaintiff had moderate limits on her ability to socially interact with others at an age appropriate level and on her ability to understand instructions. (*Id.*) Due to her anxiety, Plaintiff had moderate limits on her ability to complete detailed and complex tasks and on her ability to concentrate for at least two-hour increments. (*Id.*) Dr. Berkowitz opined it would be difficult for Plaintiff to work independently and without supervision. (*Id.*) Finally, Dr. Berkowitz opined Plaintiff had no limitations on her ability to handle funds or avoid normal hazards. (AR 288.) Dr. Berkowitz assigned Plaintiff a GAF score of 45-50.[2] (AR 287.)

---

[2] The Global Assessment of Functioning ("GAF") Scale ranges from 0 to 100 and provides a measure for an individual's overall level of psychological, social, and occupational functioning. *Demko v. Comm'r of Soc. Sec.*, 2016 U.S. Dist. LEXIS 34898, at *20-21 (S.D. Cal. Feb. 11, 2016). A GAF score in the 41-50 range indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep

Consulting psychologist, Colette Valette, Ph.D., evaluated Plaintiff on January 7, 2014. (AR 285.) Dr. Valette diagnosed Plaintiff with adult antisocial behavior and noted that Plaintiff's history indicated polysubstance abuse in full remission. (AR 296.) Dr. Valette ruled out PTSD and noted Plaintiff reported a prior diagnosis of borderline personality disorder. (*Id.*) She opined Plaintiff had no limits on her ability to understand instructions or on her ability to complete simple tasks when the tasks do not involve being around a lot of people. (*Id.*) Plaintiff had moderate limits on her ability to complete detailed tasks and on her ability to concentrate for at least two-hour increments. (*Id.*) Dr. Valette opined Plaintiff had limitations on her ability to complete complex tasks. (*Id.*) She opined Plaintiff had mild limits on her ability to socially interact with others at an age appropriate level because she became easily overwhelmed. (*Id.*) Plaintiff also had mild limits on her ability to sustain an ordinary routine without supervision because she was easily overwhelmed. (*Id.*) Finally, Dr. Valette concluded Plaintiff was fully capable of handling funds and avoiding normal hazards. (AR 297.) Dr. Valette assigned Plaintiff a GAF score of 55.[3] (*Id.*)

On August 28, 2013, the Department of Social Services requested Plaintiff's medical history at Montana State Prison. (AR 292.) However, Montana State Prison[4] did not produce any records for Plaintiff after November 8, 2012. (Doc. No. 14-1 at 2.)

**C.  Plaintiff's Testimony**

Plaintiff testified at a hearing before the ALJ on February 11, 2015. (AR 33.) She was thirty years old at the time of the hearing. (AR 36.) Plaintiff was single and had a son

---

a job." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed.).

[3] A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed.).

[4] As reflected *infra*, Plaintiff was housed in the prison as an inmate in custody.

that was twelve years old at the time of the hearing. (*Id.*) She had never held a full-time job. (AR 37.) Her previous work experience included part-time work as a stocker for Target and part-time work as a concierge for a ranch in Montana. (*Id.*)

Plaintiff testified that a guard at the Montana Women's Prison raped her while she was in custody in 2011. (AR 38.) This incident was the biggest factor contributing to her impairments, (*id.*), and her worst symptom was anxiety, (AR 52). She had a difficult time with authority figures and functioning amid people without being weary. (*Id.*)

The guard who raped her was sentenced to twenty years in prison, but he was eligible for parole prior to her hearing before the ALJ. (*Id.*) She testified her anxiety heightened in 2014 compared to 2013 as a result of her assailant's parole hearing. (*Id.*) The guard is from San Diego and his family has gang connections in the San Diego area. (AR 39.)

Plaintiff testified that on a scale of zero to ten, where a ten signified horrible symptoms requiring institutionalization and zero signified no symptoms, her symptoms ranged from a two to an eight. (AR 54.) At the time of the hearing, her symptoms were at a five or six. (AR 55.) On average over the preceding year, her symptoms were about a six. (*Id.*)

Plaintiff testified that she did not leave her residence often. (AR 40.) She lived at home with her parents and son. (AR 36.) Her parents took her son to school and to soccer. (AR 41.) She also testified that she did not go to her son's soccer games due to severe outbreaks of an autoimmune disease.[5] (*Id.*) She had a California Driver's license and vehicle. (AR 48-49.) Plaintiff did not walk anywhere, and she usually drove herself in the morning to obtain whatever she needed for the day. (AR 42.) She drove one hundred miles per week at most. (AR 49.)

Plaintiff was "trying to do some online classes with Ashford University." (AR 40.) She took one class every five weeks, and the classes took about two hours of her day. (*Id.*)

---

[5] Plaintiff testified that she had "six or so" outbreaks of an unknown disease from May of 2014 until the date of the hearing. (*Id.*) At the time of the hearing, she was awaiting test results to determine whether the disease was lupus or some other autoimmune disease. (*Id.*)

Plaintiff did not have many social activities outside the home every day because she was very sick. (AR 42.) She testified she attended church regularly but stopped when she got the autoimmune disease. (*Id.*)

She was capable of cleaning her living space in the apartment, but she was not capable of anything too rigorous "like deep clean[ing] the house." (AR 43.) She testified that she did not grocery shop, and she usually ate fast food. (AR 50.) She testified she had not been to a movie in several months, and she did not like to go to the theater because the number of people there made her uncomfortable. (*Id.*) The last time she went to a restaurant was a month prior to the hearing, and she only remained there for about twenty minutes due to her anxiety. (AR 51.) She spent her free time "out in the sun when [she] can and [conducting] a lot of internet research about school." (AR 52.)

She had not sought treatment or gone to therapy because she did not have insurance, and any other available treatments were expensive given her economic status. (AR 44.) She testified that she was not eligible for Medi-Cal, and she had not attempted to seek medical treatment under the Affordable Care Act. (AR 45.)

She testified that she also had chronic migraines. (AR 45.) Plaintiff took Topamax to treat the migraines for several years, but was no longer eligible to receive medication through the Prescription Drug Act. (*Id.*) She had migraines approximately two to three times a week. (AR 45-46.) She was unable to do anything but lay in a cold, dark room when she had a migraine. (AR 46.)

### D. The Vocational Expert's Testimony

Harlan Stock, a vocational expert, also testified at the hearing. (AR 58.) The ALJ asked Mr. Stock about two hypotheticals. First, the ALJ asked whether jobs are available for somebody with unskilled work experience at any exertional level with the following limitations:

> [W]orking around dangerous unprotected heights, machinery or chemicals or other noisy environments or (less than moderate noise). Working in other than a low stress environment, which means: (1) a low production level (where VE classified all SGA jobs as low, average

or high production; (2) no working with the general public and no working with crowds or co-workers; (3) only occasional contact with supervisors and co-workers, but still having the ability to respond appropriately to supervision, co-workers and usual, routine work situations; and (4) the ability to deal with only "occasional" changes in a routine work setting. Work at no more than a low concentration level, which means the ability to be alert and attentive to (and to adequately perform) only unskilled work tasks. Work at no more than a low memory level, which means: (1) the ability to understand, remember and carry out only "simple" work instructions; (2) the ability to remember and deal with only "rare" changes in the work instructions from week to week; and (3) the ability to remember and use good judgment in making only "simple" work related decisions.

(AR 258.) Mr. Stock opined that the person described in the above hypothetical could find work in the national economy. (*Id.*) As examples, work as a router, a ticketer, or silver wrapper[6] were available. (*Id.*)

The ALJ then changed the above hypothetical to the same work capacity, but instead of restricting the individual's ability to work in a low stress environment with "occasional" contact with supervisors, he amended the restriction to "rare" contact. (AR 59.) Mr. Stock provided the same analysis for available jobs with this alteration in mind. (*Id.*)

### E. The ALJ's Decision

The ALJ issued a written decision on March 23, 2015. (AR 17.) The decision followed the five-step process established by the Social Security Administration for determining whether an individual is disabled. (AR 20-22.)

In the first step of this five-step process, the ALJ must first determine whether the claimant has engaged in "substantial gainful activity." A positive finding at this step disqualifies the claimant from benefits. At the second step, the ALJ determines whether the claimant has one or more "severe" impairments. A negative finding at this step disqualifies

---

[6] As stated in the Dictionary of Occupational Titles Index ("DOT"), a router directs packages and other merchandise for delivery, DOT No. 222.587-038, a ticketer records and stamps labels onto merchandise or packages, DOT No. 229.587-018, and a silver wrapper assembles place settings into napkins and furnishes table settings, DOT 318.687-018.

the claimant from benefits. At the third step, the ALJ determines whether the claimant's impairment(s) is equal in severity to one of the "listed impairments" under the regulations. If so, then the claimant must be found to be disabled. If not, then the ALJ moves on to step four. Prior to step four, the ALJ must assess the claimant's residual functional capacity ("RFC"), and must determine whether the claimant's RFC permits the claimant to do his or her past relevant work. A positive finding at this step disqualifies the claimant from benefits. If the ALJ finds that that the claimant cannot do his or her past relevant work, then the ALJ must, at step five, consider whether the claimant is capable of doing any other work available in the national economy. If the ALJ makes a negative finding at step five, then the claimant is found to be disabled. *See* 20 C.F.R. §§ 416.920, 404.1520; *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

At step one, the ALJ found that Plaintiff was not engaged in "substantial gainful activity." (AR 22.) The ALJ accordingly proceeded to step two.

At step two, the ALJ found that Plaintiff had the following severe impairments: PTSD, Major Depressive Disorder, adult antisocial behavior, and Anxiety Disorder NOS. (AR 22.) The ALJ also found Plaintiff's chronic headaches were not severe. (*Id.*) The ALJ accordingly proceeded to step three.

At step three, the ALJ found that Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." (*Id.*) He found that "[n]o physician has opined that [Plaintiff's] condition meets or equals any listing [in Appendix 1, Subpart P, regulations No. 16], and the state agency program physicians opined that it does not." (AR 23.)

Before addressing step four, the ALJ found that Plaintiff had the RFC to perform a full range of unskilled work at any exertional level with the following limitations on her ability to work:

> [W]orking around dangerous unprotected heights, machinery or chemicals or other noisy environments or (less than moderate noise);

> working in other than a low stress environment, which means: [1] a low production level (where VE classified all SGA jobs as low, average or high production, [2] no working with the general public and no working with crowds or co-workers, [3] only "rare" contact with supervisors and co-workers, but still having the ability to respond appropriately to supervision, co-workers and usual, routine work situations, [4] the ability to deal with only "occasional" changes in a routine work setting;
>
> work at no more than a low concentration level, which means the ability to be alert and attentive to (and to adequately perform) only unskilled work tasks;
>
> work at no more than a low memory level, which means: [1] the ability to understand, remember and carry out only "simple" work instructions, [2] the ability to remember and deal with only "rare" changes in the work instructions from week to week, [3] the ability to remember and use good judgment in making only "simple" work related decisions.

(*Id.*) In making this determination, the ALJ expressly gave "some weight" to the opinion of Dr. Berkowtiz because although his opinion was consistent with his mental status examination, his narrative did not support the low GAF score he assigned Plaintiff. (AR 25.) Furthermore, Dr. Berkowtiz's "reference to the need for supervision" was not found elsewhere in the record, and "therefore [was] not mentioned in the RFC." (*Id.*)

The ALJ expressly gave very little weight to Ms. Swartz's opinion because it was not supported by clinical findings and was inconsistent "with her report that [Plaintiff] can 'interact appropriately and communicate effectively with a variety of people'" but "she has difficulties effectively communicating with her mother." (AR 25.)

With respect to the medical experts, the ALJ gave significant weight to the opinion of Dr. Valette because her opinion was supported by the findings of her mental status examination as well as that of Dr. Berkowitz. (AR 26.)

Finally, the ALJ also found that Plaintiff's testimony "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR 24.)

At step four, the ALJ considered the testimony of the vocational expert. He found that while Plaintiff had no past relevant work, considering Plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy." (AR 26.) As such, the ALJ found that Plaintiff was not disabled. (AR 28.)

## II. STANDARD OF REVIEW

Under 42 U.S.C. § 405, a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *Richardson*, 402 U.S. at 401; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. *Lingenfelter*, 504 F.3d at 1035 (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998) (citations omitted). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. *Id.* at 720-21 (citing *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)).

## III. DISCUSSION

### A. The ALJ's Credibility Findings are Free of Legal Error

The ALJ found that "[a]fter careful consideration of the evidence, . . . [Plaintiff's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," and the ALJ made no findings of malingering. (AR 24.) Therefore, the Court's task is to determine whether the ALJ's adverse credibility finding is supported by

substantial evidence under the clear-and-convincing standard. *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1161 (9th Cir. 2008). The Court addresses Plaintiff's three main arguments below and ultimately concludes that the ALJ did not err because substantial evidence supports the ALJ's findings.

### 1. Legal Standard: An ALJ's Adverse Credibility Findings

"An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Likewise, Congress did not intend to give Plaintiff's subjective testimony enough weight to be the sole basis for granting benefits. 42 U.S.C § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"). Where "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on clear and convincing reasons." *Carmickle*, 533 F.3d at 1160 (citations and internal quotations omitted); *see also Simon v. Colvin*, 749 F.3d 1106, 1107 (9th Cir. 2014).

### 2. The Objective Evidence is Inconsistent With Plaintiff's Subjective Symptom Testimony

The ALJ's finding that the objective medical evidence was inconsistent with Plaintiff's subjective testimony was supported by substantial evidence and was not erroneous.

With respect to using objective evidence to determine Plaintiff's credibility, "[c]ontradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle*, 533 F.3d at 116; *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995). Here, the ALJ found:

> The weight of the objective evidence does not support the claims of the claimant's disabling limitations to the degree alleged. Mental status examinations do not reveal significant abnormalities that support the limitations claimed (e.g. Exhibits 6F/2-3; 8F/3-4). The lack of objective findings is inconsistent with the disabling limitations she continues to allege.

(AR 24.) The ALJ cited the opinions of Dr. Berkowitz and Dr. Valette as the objective medical evidence inconsistent with Plaintiff's claimed limitations. (*Id*.)

Dr. Valette noted that Plaintiff's posture, gait, and mannerisms were all normal. (AR 295.) Dr. Valette mentioned Plaintiff's behavior seemed anxious at times, but overall, Plaintiff demonstrated an intact memory and organization in her thought process.[7] (*Id.*) She was dressed appropriately in "hip fashion, wearing jewelry, full facial makeup, and smelling of perfume." (*Id.*) Dr. Valette concluded Plaintiff had a marked ability to complete complex tasks and a moderate ability to complete detailed tasks. (*Id.* at 296.) However, she had only mild limitations in her ability to interact socially with people and perform an ordinary routine without sustained supervision. (*Id.*) She also had no limitations in performing simple tasks, being able to avoid normal hazards, and was able to handle funds. (*Id.* at 296-97.)

Dr. Berkowtiz noticed Plaintiff was visibly anxious, but spoke clearly and 'put forth her best efforts' in the interview. (AR 286.) Dr. Berkowitz opined Plaintiff was fully oriented in their meeting, and she was able to demonstrate "normal judgment." (*Id.*) Dr. Berkowtiz stated Plaintiff's "thought processes were well organized and without evidence of internal stimuli." (AR 286.) During the evaluation, Plaintiff was asked questions regarding her judgment. (*Id.*) Dr. Berkowtiz concluded Plaintiff had moderate limitations on her ability to perform complex and detailed tasks and could not work independently without supervision of these tasks. (*Id.* at 287.) However, like Dr. Valette, he opined Plaintiff had no limitations in performing simple tasks, avoiding normal hazards, and could handle funds. (*Id.* at 287-88.)

---

[7] Dr. Valette noted that Plaintiff was greatly affected by the very recent suicide of a close friend. (AR 295-96.) Although Plaintiff exhibited depression and cried during the assessment, Dr. Valette could not determine if this was situational due to the suicide or Plaintiff's normal state. (*Id.*)

The objective evidence presented by these two physicians is inconsistent with Plaintiff's subjective testimony that she is totally disabled. Both physicians opined about certain limitations that may impact her ability to work in some manner, but nowhere was it evidenced that Plaintiff was unable to work at all. The ALJ partly based his credibility assessment on the objective medical evidence as a whole and found that "[n]one of the [Plaintiff's] physicians have opined that she is totally and permanently disabled from any kind or work, especially the easier unskilled work suggested hereafter by the vocational expert." (AR 25.) This was an accurate assessment of the medical evidence before the ALJ because no contrary finding exists in the record. "Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 CFR § 404.1527(c)(4). The ALJ properly weighed the objective evidence to determine Plaintiff's credibility.

### 3. Daily Activities

Although Plaintiff objects to the ALJ's consideration of her daily activities, (Doc. No. 17. at 7), the "ALJ [is] permitted to consider daily living activities in his credibility analysis." *Burch*, 400 F.3d at 681; *see also* SSR 16-3p ("In addition to using all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR §§ 404.1529(c)(3), 416.929(c)(3). These factors include: [1] Daily activities"). In evaluating the credibility of Plaintiff's testimony with regards to her daily activities, the issue is "whether the claimant engages in daily activities inconsistent with the alleged symptoms." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). A claimant's "daily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (quoting *Fair*, 885 F.2d at 603).

Here, the ALJ specifically found that Plaintiff's "allegations of significant limitations [were] not borne out in her description of her daily activities," (AR 24), and the sparse medical records in this case support this finding.[8] Specifically, the ALJ found:

> The claimant's allegations of significant limitations are not borne out in her description of her daily activities (Exhibits 5F/3-4; 8F/3). She is independent in her ability to manage her own transportation and drives to her appointments. She told her therapist that she does not need assistance or direction in attending to her activities of daily living (Exhibit 5F/3) and is able to clean her house and even help with "minor home improvement" (Exhibit 5F/4). She also is able to care for her son, help him with his homework, walk her dog, and go to church (Exhibit 8F/3).

(AR 24.) The ALJ's findings regarding Plaintiff's daily activities were not erroneous and were supported by substantial evidence under the clear-and-convincing standard.

The ALJ properly found Plaintiff not entirely credible by applying *Orn* because Plaintiff's daily activities are inconsistent with her subjective symptom testimony. First, the ALJ identified the specific portion of Plaintiff's subjective symptom testimony that was inconsistent with her daily activities: the intensity, persistence, and limiting effects of her symptoms. (AR 24.) The ALJ then properly provided specific reasons for doubting that testimony based on Plaintiff's daily activities. The ALJ finally explained why those daily activities undermined the claimed intensity, persistence, and limited effect of Plaintiff's impairments. (*Id.*) In doing so, the ALJ implicitly recognized that the physical, mental, and social capability of taking a two hour online class daily, caring for a child, assisting in household tasks, managing her own transportation, driving herself to appointments, attending church, and walking her dog undermined her complaints of disabling symptoms and limitations. *See Fair*, 885 F.2d at 603 ("[I]f, despite his claims of pain, a claimant is able to perform household chores and other activities that involve many

---

[8] For example, Plaintiff told her treating physician she was able to help with "minor home improvements." (AR 279.)

of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working.")

The ALJ provided clear and convincing reasons why Plaintiff's daily activities were inconsistent with her allegations of disability. *See Molina*, 674 F.3d at 1112.

### 4. Conservative Treatment

Plaintiff contends the ALJ erred in considering her conservative treatment as a factor in determining her credibility. (Doc. No. 17 at 9.) Specifically, she contends that "it fails common sense to require an individual suffering from mental illness to require more than what Plaintiff has done for her situation, other than to be institutionalized. . . . [R]equiring a psychiatric hospitalization simply falls short of clear and convincing." (*Id.*)

As an initial matter, the Ninth Circuit is clear that an ALJ may permissibly consider a claimant's conservative treatment in making an adverse credibility determination.[9] *Parra*, 481 F.3d at 750-51; *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). Thus, the ALJ

---

[9] Plaintiff testified that she attempted to receive treatment through Medi-Cal, but was ineligible. (AR 44.) She further testified that she did not attempt to seek treatment under the Affordable Care Act, and that she became "fed up" with being denied insurance. (AR 45.) No other evidence was submitted by Plaintiff at the hearing to demonstrate her inability to pay, or her efforts to seek available resources for medical treatment. A claimant's inability to pay may justify conservative treatment and render it an inapplicable factor in credibility determinations in certain circumstances. SSR 82-59 (requiring that all possible resources, including "free or subsidized source[s] of treatment" and those "reasonably available in the local community" be explored by a claimant before the inability to pay for treatment justifies conservative treatment). Here, the ALJ did not make a factual finding about Plaintiff's ability to afford treatment. However, whether Plaintiff's medical treatment is conservative because she cannot afford the proper care is not before this Court. Plaintiff has not raised financial inability as grounds for reversal and remand. *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief. . . . We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim."). Therefore, whether she can afford treatment is not before this Court, and the ALJ otherwise properly considered Plaintiff's conservative treatment as a factor in assessing her credibility.

properly considered Plaintiff's conservative treatment. And when he did so, the ALJ's adverse credibility finding based on her conservative treatment was supported by the opinions of Ms. Swartz (AR 274) and Dr. Berkowitz (AR 285), as well as the sparse medical record.

The ALJ found that Plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual. . . . She has never required emergency room or inpatient psychiatric hospitalization for her allegedly disabling mental symptoms. There is no evidence of cognitive deficits due to her mental impairments." (AR 24-25.) Indeed, the medical documentation in the record is quite sparse compared to other similar cases. Moreover, the more severe medical opinions of Dr. Berkowitz and Ms. Swartz were not supported by objective medical evidence from that sparse record. For example, Dr. Berkowitz opined Plaintiff would have difficulty completing detailed tasks without marked supervision and assigned Plaintiff a GAF score of 45-50. (AR 287.) Such a low GAF score indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed.). Setting aside the fact that this finding appears to conflict with the doctor's concurrent finding that Plaintiff had *no* limitations to perform "an ordinary routine without sustained supervision," the medical record as a whole does not support such serious symptoms or impairments. Rather, as the ALJ found, the record is more consistent with Dr. Valette's 55 GAF score assessment, which indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *Id.* Indeed, Dr. Berkowitz noted that although Plaintiff had some difficulty staying focused and appeared uncomfortable, she was able to sustain an ordinary routine without supervision and had no limitations performing simple tasks. As the ALJ found (AR 25), these limitations are not consistent with such a low GAF score.

As for Ms. Swartz's opinion, although she assigned Plaintiff a higher GAF score than any of the physicians in this case,[10] the narrative of her report reflected a person much more limited than the GAF score would indicate. For example, while such a GAF score reflects moderate symptoms and impairments, Ms. Swartz opined Plaintiff would have "substantial" difficulty with mental aspects of the work environment, such as "understanding, remembering, sustained concentration [and] persistence, social interaction, and adaptation." (AR 274.) However, as the ALJ found, this assessment is even more extreme than the other opinions and is inconsistent with the GAF scores assigned by the other physicians.

Of the three assessments discussed herein, Dr. Valette's report was the most credible, internally consistent, and supported by the medical record. Although Dr. Valette noted Plaintiff's discomfort and emotional state after a friend's recent suicide, Plaintiff was nonetheless able to perform tasks at a certain functional level given her various limitations. Ultimately, the ALJ's finding that "[t]he weight of the objective evidence [did] not support the claims of the claimant's disabling limitations to the degree alleged" was an accurate assessment. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective . . . testimony cannot be rejected on the *sole ground* that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's symptoms and their disabling effects.") (emphasis added). Considering the treatment Plaintiff received compared to her alleged disabling symptoms, the ALJ's credibility decision in reliance on her conservative treatment is supported by substantial evidence.

---

[10] Ms. Swartz assigned Plaintiff a 58 GAF score. Such a score indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed.)

To the extent Plaintiff contends the ALJ found her testimony not credible because he required her to be institutionalized, the Court finds this is a mischaracterization of the ALJ's findings. The ALJ permissibly exercised his authority and found she was not credible because her treatment was conservative compared to the severity of her alleged symptoms. The ALJ merely provided institutionalization as an example of the type of treatment someone with Plaintiff's allegedly debilitating symptoms might seek.[11] But nowhere in the record did the ALJ suggests institutionalization was a requirement for disability classification.

### 5. Conclusion

In sum, the ALJ concluded that Plaintiff's subjective complaints were not fully credible by relying in detail on the entire record. The ALJ relied on the medical record and opinions by doctors and did not reject Plaintiff's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of her symptoms. The ALJ also relied on the treatment that Plaintiff had undertaken and the inconsistencies between her daily activities and claimed subjective symptoms. After thoroughly reviewing the record, this Court is satisfied that the ALJ's decision is supported by substantial evidence and is free of legal error. This Court "may not substitute [its] judgment for that of the Commissioner" and recommends that the ALJ's decision to deny Plaintiff's application for social security benefits be affirmed. *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999) (citing *Reddick*, 157 F.3d at 721). Accordingly, Plaintiff's summary judgment motion should be DENIED.

---

[11] The ALJ's reasoned: "The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. The claimant's course of treatment since November 5, 2012, has generally reflected a conservative approach. She has never required emergency room or inpatient psychiatric hospitalization for her allegedly disabling mental symptoms." (AR 24.)

**B. Defendant is Entitled to Summary Judgment**

In addition to Plaintiff's summary judgment motion, Defendant's cross-motion for summary judgment is pending before the Court. Defendant argues the ALJ properly applied the correct legal standards and supported his decision with substantial evidence. Plaintiff did not file an opposition to the Cross-MSJ and has not raised any other argument not already addressed in this Report and Recommendation.[12]

As discussed extensively above, the ALJ provided specific reasons for his conclusion of Plaintiff's non-disability, and the record supports the ALJ's findings. Moreover, with respect to Plaintiff's credibility and claims of greater disability, the ALJ specifically identified which portions of Plaintiff's testimony were not credible and then provided clear and convincing reasons for discounting that testimony. Contrary to Plaintiff's argument, the ALJ properly evaluated, among other things, her participation in daily activities, her conservative treatment for the severe symptoms alleged, and the inconsistency between the objective evidence and severe symptoms alleged. The Court recommends that Defendant's Cross-MSJ be GRANTED.

**IV. CONCLUSION**

Based on the foregoing, the ALJ did not err in discounting Plaintiff's testimony because he provided specific, clear and convincing reasons which were supported by substantial evidence. Accordingly, this Court RECOMMENDS that Plaintiff's MSJ be DENIED and that Defendant's Cross-MSJ be GRANTED.

This Report and Recommendation is submitted to the United States District Judge assigned to this case pursuant to the provisions of 28 U.S.C § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

///

///

---

[12] Plaintiff's failure to file an opposition to Defendant's summary judgment motion may constitute consent to granting Defendant's summary judgment motion or the waiver of arguments in opposition thereto. S.D. Cal. Civ. L. R. 7.1(f)(3)(c).

**IT IS ORDERED** that **no later than August 3, 2017**, any party to this action may file written objection with the Court and serve a copy on all parties. The document shall be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the court and served on all parties **no later than August 17, 2017**. The parties are advised that failure to file objections within the specific time may waive the right to raise those objections on the appeal.

**IT IS SO ORDERED.**

DATED: July 12, 2017

Hon. William V. Gallo
United States Magistrate Judge